# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1183

_____

Estate of Ragan Wade; Edna Strother,     *
Administratrix of the Estate of Ragan   *
Wade,     *
    *
          Appellants,     *
    *   Appeal from the United States
      v.     *   District Court for the
    *   Western District of Arkansas.
Wayne Tompkins; Columbia County   *
Sheriff's Department; Columbia     *     [UNPUBLISHED]
County, AR; Terrie Grace, Individually; *
Arkansas State Police,     *
    *
          Appellees.     *

_____

Submitted: July 23, 2003
Filed: September 4, 2003

_____

Before BYE, BOWMAN, and MELLOY, Circuit Judges.

_____

PER CURIAM.

The Estate of Ragan Wade and Administratrix Edna Strother appeal the district court's[1] adverse grant of summary judgment in the 42 U.S.C. § 1983 action brought

_____

[1]The Honorable Harry F. Barnes, United States District Judge for the Western District of Arkansas.

after Ragan Wade died while detained in the Columbia County (County) jail. The record before the district court reflected as follows.

In September 1998 the County circuit court entered orders regarding the jail, including that a jailer was to be stationed on the second floor twenty-four hours a day. Wayne Tompkins, the sheriff from 1997 through 2002, knew of the orders regarding second-floor staffing, and made suggestions to County authorities about increasing jail staff. The second-floor staffing order was followed, but the staff member stationed there left to eat meals, use the bathroom, and book or release prisoners. It was jail policy during the relevant period that when staff were aware an inmate was a suicide risk, the inmate was placed in the first-floor cell closest to the dispatcher (which had a camera in it), the inmate was stripped to his underwear, and the mattress, sheets, and blanket were removed. The jailers at that time had attended a five-day academy which included a class on suicide, and one jailer had taken a class elsewhere on recognizing suicidal persons.

On July 13, 2000, Wade's wife Heather walked into a bedroom and--from what she observed--believed that Wade, who was nineteen at the time, was having a sexual encounter with her niece and her daughters from a former marriage. She told Wade to leave. He denied doing anything wrong, stating before he left that he was not going to the penitentiary, he would kill himself, and Heather did not need to attend his funeral. Later the girls and Heather's son, who were between the ages of five and ten, told her about incidents of sexual activity with Wade. Heather contacted the sheriff's department, and that day the County's criminal investigator, Todd Scott, questioned Heather; the next day a state police special investigator, Terrie Grace, interviewed Heather and the children. Heather told Scott and Grace about Wade's reference to killing himself, but said she did not take the statement seriously as Wade had repeatedly stated when angry that he was going to kill himself, or something similar, and had never attempted suicide. Scott and Grace did not interview Wade, but they discussed his statement to Heather and determined it was an attempt to

manipulate Heather and not a serious suicide threat; the statement was not reported to anyone at the jail where Wade was later held, but it was included in Scott's written notes, which were not reviewed by anyone. Sheriff Tompkins was not involved in the investigation, and he did not recall knowing about Wade's being jailed until learning of his suicide.

On July 17 a warrant was issued for Wade's arrest. Meanwhile, he was living with Strother (his mother); he did not mention suicide to her or act as if he were suicidal. When Wade and Strother learned of the warrant, she took him in and he was booked the evening of July 17. According to the jailer who booked him, Wade neither expressed suicidal thoughts nor acted as if he intended to harm himself, or the jailer would have instituted suicide precautions. Detainees' arrest records (which for Wade might have included Scott's report) were kept in a file, but jailer Paul Womble testified that the jailers were not required to read the files.

During Wade's detention, he or one of the other inmates (on his behalf) talked to Strother on the telephone several times, and Strother visited once; there was no indication that Wade was thinking of harming himself. On July 22 Wade called his family and told them that other detainees had beaten him, after which Strother called and talked with Womble, Wade's preacher visited him and observed no signs of a beating, and Womble took pictures and then moved Wade to a second-floor cell at his sister's request. Womble also did not see or hear anything that would have made him believe Wade was suicidal.

On the afternoon of July 25, jailer Claudie Davis was on duty on the second floor, and a new jailer and a dispatcher were on the first floor. About 4:30 Wade asked what was for dinner and asked to make a phone call. Davis told him he could make a call later and then left the second floor to book and release two individuals and to make rounds. About thirty minutes later a second-floor detainee yelled out that there was an inmate who was not moving, and Davis returned to the second floor to

find Wade in a squatting position with a sheet around his neck and tied to a vent. Davis unlocked the cell door and entered, took the sheet off, began CPR, and alerted dispatch to call an ambulance. He continued CPR until the ambulance crew arrived; Wade died later at a hospital.

Davis testified that he had seen no signs that Wade was a suicide risk, but that if information about Wade's statement to his wife had reached him after the arrest, he would have presumed Wade was suicidal. Similarly, Sheriff Tompkins testified that if Wade's statement had been brought to his attention, he would have ensured that his staff followed suicide precautions. None of Wade's family members--including Strother and her husband, Wade's three siblings, and Wade's grandmother--thought that Wade was contemplating suicide; in fact, at their depositions, they expressed doubts that he had committed suicide.

After Wade's death, the Estate and Strother sued the County, the sheriff's department, and Tompkins,[2] claiming various constitutional violations. They alleged that Tompkins knew or should have known of Wade's intent to commit suicide, and the County knew or should have known of Tompkins's repeated violations of state jail standards, but that Tompkins and the County consciously disregarded Wade's welfare when Tompkins allowed him to be left unattended with the necessary items to hang himself, and the County failed to assure compliance with jail standards. In resisting summary judgment, the Estate and Strother contended it was the County's policy not to maintain adequate staffing, the jailers' policy not to review detainees' arrest files, and Tompkins's policy not to review Investigator Scott's work.

We review de novo the grant of summary judgment, giving the Estate and Strother the benefit of all reasonable inferences that may be drawn from the record.

---

[2]The district court's ruling disposing of claims against the other defendants, the Arkansas State Police and Special Agent Terrie Grace, is not an issue on appeal.

See Hott v. Hennepin County, 260 F.3d 901, 904-05 (8th Cir. 2001). Allegations that officials failed to prevent jail suicides of pretrial detainees are generally treated as claims of failure to provide adequate medical treatment, where plaintiffs must show the detainee suffered from a serious medical need that defendants knew of, yet ignored. See id. at 905 (analysis focuses on particular risk of suicide posed by specific detainee; recognizing that Fourteenth Amendment guarantees pretrial detainees at least as many protections as Eighth Amendment, and extends to them as well protection from deprivations that are intended to punish). In such cases, defendants may also be liable for not protecting the detainee from more generalized harms if the plaintiff shows that defendants were deliberately indifferent to a substantial risk of serious harm. See id. at 906-07 (analysis of allegation that officers failed to conduct cell checks).

Because the Estate and Strother did not specify in what capacity they were suing Tompkins, it must be assumed that he was sued only in his official capacity. See Artis v. Francis Howell N. Band Booster Ass'n, Inc., 161 F.3d 1178, 1182 (8th Cir. 1998) (if complaint does not specifically name public official in individual capacity, it is presumed he is sued only in his official capacity). Appellants have not attempted to assert--and are now precluded from asserting--an individual-capacity claim against Tompkins. Cf. id. (declining to permit appellant to amend his complaint to add individual-capacity claim against school official, as he had ample time to seek amendment to his complaint below but failed to do so).

A suit against Tompkins in his official capacity is actually a suit against the County. Cf. Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 904-05 (8th Cir. 1999) (official-capacity claims against police board members must be treated as claims brought against municipality), cert. denied, 528 U.S. 1157 (2000). To avoid summary judgment on their claims against the County, the Estate and Strother had to create a genuine issue of material fact as to whether violations of Wade's constitutional rights occurred pursuant to a County policy, or whether there was

misconduct so pervasive among the County's non-policymaking employees as to constitute custom or usage with the force of the law. See id. at 905. They could not rely on a supervisory-liability theory as to Tompkins, cf. Rogers v. City of Little Rock, 152 F.3d 790, 800 (8th Cir. 1998) (discussing and distinguishing between official- and individual-capacity claims against police chief in sexual-harassment action), or as to the County, cf. Kuha v. City of Minnetonka, 328 F.3d 427, 440 (8th Cir. 2003) (municipality cannot be liable under § 1983 under respondeat superior theory). Similarly, to the extent the sheriff's department is suable under section 1983, see Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992) (sheriff's departments are not usually considered legal entities subject to suit under § 1983), plaintiffs had to create trialworthy issues as to whether the department's allegedly unconstitutional actions or inactions were pursuant to an officially adopted policy statement, ordinance, regulation, or decision, or a permanent and well settled unofficial custom, see Tilson v. Forrest City Police Dep't, 28 F.3d 802, 807 (8th Cir. 1994), cert. denied, 514 U.S. 1004 (1995).

We find that the purported policies or customs upon which the Estate and Strother relied do not help them. Even if the jailers had reviewed Wade's arrest file and seen Scott's report, or even if Tompkins had routinely reviewed Scott's reports, we conclude--despite Tompkins's and Davis's after-the-fact testimony about what they would have done had they known of Wade's statement--that review of the report would not have charged the jailers or Tompkins with knowledge that Wade was at particular risk for suicide during his detention. This is because Wade's statement was made to his wife (not to Scott or Grace) four days before he turned himself in and immediately after Heather confronted him with her suspicions and told him to leave; Heather told Scott and Grace she did not perceive the statement as an actual suicide threat based on Wade's prior behavior; and even Wade's mother, with whom he lived after the incident, did not believe he was suicidal. Further, assuming the 1998 circuit court order about second-floor staffing did not permit the practice of jailers' leaving briefly to attend to other duties and take breaks, the jailers' noncompliance with the

order might have been relevant to the deliberate-indifference inquiry, but could not serve as the sole basis for section 1983 liability. See Cagle v. Sutherland, 334 F.3d 980, 986 (11th Cir. 2003) (per curiam) (§ 1983 liability is based on conformity with federal constitutional and statutory requirements). Finally, the failure to provide more staff to assure that staff was always on the second floor could not constitute deliberate indifference to the strong likelihood that suicide would result, because inmates identified as suicide risks were placed in a first-floor cell. Cf. id. at 986-88 (county's failure to fund second nighttime jailer pursuant to consent decree did not demonstrate county's awareness of strong likelihood for suicide, as decree derived from jail-condition class action where suicide was not factor). Accordingly, we conclude that summary judgment was properly granted to the County defendants and we affirm.

BYE, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's opinion affirming the district court's grant of summary judgment in favor of defendants Sheriff Wayne Tompkins[3] and the Columbia County Sheriff's Department. I dissent, in part, however, because I believe the grant of summary judgment as to Columbia County should be reversed.

Heather Wade allegedly discovered her nineteen-year-old husband, Ragan Wade, engaged in a sexual act with her niece and her daughters from a previous marriage. The children ranged in age from 5 to 10. Heather ordered Ragan out of their home. As he left, Ragan threatened to kill himself rather than go to prison. Heather reported the incident, along with Ragan's suicide threat, to police who then arrested him. Ragan was booked into the Columbia County jail, and a police report

---

[3]To the extend the complaint alleges a cause of action against Sheriff Tompkins individually, I would affirm the grant of summary judgment. To the extent the complaint alleges a cause of action against Sheriff Tompkins in his official capacity, I would construe it as stating a cause of action against the county and reverse the grant of summary judgment for the reasons stated herein.

containing Ragan's suicide threat was incorporated into the jail's file. It is undisputed no one at the jail bothered to read Ragan's file, and consequently no one was aware of his threat to commit suicide. Ragan later made good on his threat and hanged himself in his cell.

Appellants allege Ragan's suicide resulted directly from the jailers' failure to read his file and the county's policy encouraging jailers to ignore prisoner files. Appellants further contend the policy demonstrates a deliberate indifference to the rights of prisoners because it prevents jailers from obtaining information about prisoners' serious medical needs, i.e., risk of suicide.

Ragan, a teenager, was accused of a disgraceful crime which engenders in others - even among other jail inmates - feelings of contempt and disgust. He was also arrested and jailed. These circumstances serve to heighten the seriousness of his suicide threat. Employees at the jail who had been trained to recognize suicide risks, however, were ignorant of this serious suicide risk because the county encouraged jailers not to review prisoner files. Had jailers been made aware of Ragan's threat, Sheriff Tompkins and jailer Claudie Davis testified they would have taken steps to implement the jail's suicide prevention protocol.

In Gregoire v. Class, 236 F.3d 413, 418 (8th Cir. 2000), we held a prison official was not deliberately indifferent to a prisoner's risk of suicide because he waited approximately 45 minutes before acting on a call from the prisoner's wife relaying the prisoner's suicide threat. In so holding, however, we stated "[i]f an official completely disregarded a phone call . . . alerting the official to a suicide risk, such act may well constitute deliberate indifference." Id. Here, we have an alleged county policy which resulted in the equivalent of an official completely disregarding information that would have alerted him to a serious suicide risk. Accordingly, I would reverse the grant of summary judgment as to Columbia County and remand for further proceedings.

A true copy.

   Attest:

          CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.